**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| J.D., | Case No. 19-cv-04825-BLF |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| EAST SIDE UNION HIGH SCHOOL DISTRICT, | |
| Defendant. | [Re: ECF 66, 67] |

J.D. and his father,[1] seeking the best education for J.D., and the East Side Union High School District, committed to providing educational services as required by law, disagree whether J.D. continued to qualify for special education services before his graduation from high school. Both parties have filed motions for summary judgment. *See* Pl.'s Mot., ECF 67; Def.'s Mot., ECF 66. J.D. seeks to overturn the decision of Administrative Law Judge ("ALJ") Charles Marson, which found that the District properly followed the required procedure and exited J.D. from special education and related services because he was no longer eligible for them. *See* Pl.'s Mot. The District seeks affirmation of the ALJ's decision. *See* Def.'s Mot. After reviewing the Parties' briefing, the underlying administrative record, and oral arguments at the August 20, 2020 hearing, the Court will uphold the ALJ's decision and GRANT the District's motion and DENY J.D.'s motion.

---

[1] When this litigation commenced, J.D. was not yet eighteen years old, and his father served as his guardian ad litem. Since J.D. turned eighteen in 2020, he now asserts these claims in his own name.

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.    BACKGROUND

J.D. was a junior in high school at the time of the due process hearing and ALJ decision. Administrative R. ("AR") 1349 ¶ 1. He was identified as a student with a language or speech disorder in preschool and started receiving special education services at age four. *Id.* ¶¶ 3-4. He was eligible for special education in the category of speech and language impairment, as it was then known, and in the category of specific learning disability. *Id.* He was eligible in the latter category because of a severe discrepancy between his nonverbal reasoning skills and academic performance and a processing disorder in his cognitive ability of expression. *Id.* ¶ 4. J.D. was an English-language learner at the time, as his primary language at home was Spanish. *Id.* Although J.D.'s father believes J.D. is autistic, the ALJ found that J.D had never been formally diagnosed with autism spectrum disorder. AR 1360 ¶ 54. A 2018 diagnosis of mild-to-moderate autism spectrum disorder submitted by the father was not found credible by the ALJ. AR 1360-61 ¶¶ 55-57. The medical professional had evaluated a then-fifteen-year-old J.D. in the presence of his father and used a ratings scale that was not appropriate for children older than twelve years of age, among other serious flaws. *Id.* J.D.'s father also claimed his son had a diagnosis of attention-deficit/hyperactivity disorder (ADHD), but the ALJ determined that there was no evidence that any professional had ever given him that diagnosis. AR 1362 ¶ 64. On the contrary, two medical professionals engaged by the family had declined to assign J.D. an ADHD diagnosis. *Id.*

In 2014, when J.D. was twelve years old and a student in another district, he was assessed for his triennial review. AR 1350 ¶ 6. His Individualized Education Program ("IEP") team found him no longer eligible for special education due to a specific learning disorder.  *Id.* ¶ 7. A school psychologist concluded that "a significant discrepancy does not exist between [Student's] cognitive abilities and his standard achievement scores in reading, mathematics, or written language." *Id.* A speech and language pathologist assessed J.D. and found that he was "functioning within the mean in the basic foundation in Spanish and English oral language abilities." *Id.* ¶ 6 J.D.'s father protested these findings, and the school allowed J.D. to remain eligible in the category of speech and language disorder. *Id.* ¶ 7.  Despite finding him no longer eligible in the category of specific learning disorder, the school continued to offer him specialized

academic instruction. *Id.*

By high school, J.D. had been designated as English proficient and received all of his educational instruction in English. AR 466. J.D. entered the District as a freshman in August 2016. AR 954. His IEP from his previous school provided him 60 minutes per week of specialized academic instruction and 30 minutes per week of group speech and language therapy outside of class. AR 1350 ¶ 8. At the time of his first IEP from the District on October 6, 2016, J.D. was receiving four A+ grades and two A- grades. *Id.* His speech support was reduced to 30 minutes a month of "consultation to staff and student." *Id.* His IEP also offered other accommodations, including checks for understanding, an opportunity to re-take failed tests, simplified complex directions, re-teaching or review in small group or individually, nonverbal cues for redirection, and support in organizing his binder. *Id.* J.D. did not receive specialized academic instruction after his freshman year. AR 1351 ¶ 9.

J.D.'s next triennial review was scheduled for the following school year (October 2017), his sophomore year, and the District began preparing for the review in May 2017. AR 1351 ¶ 9, 1374 ¶ 23; Pl.'s Mot. 4. In May 2017, the District gave J.D.'s father an assessment plan that he did not return until October. AR 1374 ¶ 25; 2681:17-21.  William Coleman, one of the district's school psychologists, evaluated J.D. for the his physcoeducational assessment. AR 1272-1321. Mr. Coleman gave J.D.'s father a draft of his report before the end of the year but did not complete and distribute his final report until February 26, 2018. 1363 ¶ 72. Dr. Yvana Uranga-Hernandez completed J.D.'s speech and language assessment in February 2018 as well, so the District scheduled an IEP team meeting for March 29, 2018, to discuss both reports. AR 1363 ¶ 73. J.D.'s father cancelled the meeting. AR 1363 ¶ 73. The meeting finally occurred on May 17, 2018. AR 1363 ¶ 73.

The ALJ found that the IEP team initially attempted to make a determination of J.D.'s eligibility for special education services, as required by statute, at the May 17, 2018 meeting, but the meeting ended after ninety minutes when the father opposed a staff member's request for a bathroom break and declined to participate and departed after the break. AR 1367 ¶ 90. According to the ALJ, this was after he interrupted the District's staff "hundreds of times" and attacked the

credentials of Dr. Uranga-Hernandez, the bilingual speech and language pathologist retained by the District. AR 1366-67 ¶ 88. The District then attempted to reschedule the meeting in order to continue, only to have J.D.'s father cancel the meetings. *See, e.g.*, AR 639; *see also* AR 1367 ¶ 91. The continuation of the May 2018 IEP team meeting finally occurred on December 4, 2018. AR 691, 1367 ¶ 93. The ALJ concluded that once again, J.D.'s father was domineering and demanded the meeting be continued to another date an hour after it began and before the District's IEP team was able to discuss the subject of eligibility. AR 1367 ¶¶ 94-97. The ALJ summarized the record as showing that J.D.'s father announced that the IEP team could not fairly decide the issues before it without an alleged November 2018 report he obtained from a psychiatrist that proved his son was autistic. *Id.* ¶ 97. The report, though, was never actually produced at any point in this process and was not introduced at the due process hearing. *Id.* ¶ 97 n.7. The December 4, 2018 meeting ended unresolved, and on December 5, 2018, J.D.'s father told the District that all IEP team meetings would be on hold until his pending federal and state complaints had been resolved. AR 934, 1369 ¶ 98. The ALJ found that the District attempted to reschedule the IEP team meeting to no avail. AR 1369 ¶ 98.

The District filed a request for due process hearing with the Office of Administrative Hearings ("OAH") on January 11, 2019. AR 1347. The ALJ conducted the hearing on March 19, 20, 21, 26, 27, and 28, 2019. *Id.* Both sides were represented at the hearing by the same counsel who appear here. *Id.* J.D.'s father attended on some hearing days on behalf of his son. *Id.* J.D. did not attend. *Id.* Closing briefs were submitted on April 22, 2019. *Id.*

There were four issues before the ALJ: 1) May the District exit J.D. from special education and related services because he is no longer eligible for them in any category; 2) Did the District provide parents with meaningful participation in the IEP process at the IEP team meeting on December 4, 2018; 3) Was the assessor who conducted the independent educational evaluation ("IEE") of J.D.'s speech and langue (Dr. Uranga-Hernandez) actually an employee of the District; and 4) were the District's triennial assessments appropriate such that J.D. is not entitled to an IEE of his speech and language or psychoeducational status at the District's expense? AR 1347-48. In a 42-page opinion, AR 1347-1388, the ALJ found that J.D. was no longer eligible for special

United States District Court
Northern District of California

education in any category. AR 1348. Further, the ALJ found that the District gave J.D.'s parents a meaningful opportunity to participate in the IEP process at the December 4, 2018 meeting, and J.D.'s father "spoke scores if not hundreds of times" at the meeting. *Id.* The ALJ found that Dr. Uranga-Hernandez's assessment was a component of J.D.'s triennial evaluation and not an IEE. AR 1348. However, because the triennial assessments were legally compliant except in minor ways that had no adverse effect on J.D. or his father, J.D. was not entitled to an IEE at public expense. *Id.* J.D. filed his initial federal complaint challenging the ALJ's decision on August 14, 2019. *See* Compl., ECF 1. J.D. has since graduated from high school. Pl.'s Mot. 3; Def.'s Opp'n 16, ECF 71.

## II.    LEGAL STANDARD

The Individuals with Disabilities Education Act ("IDEA") establishes a comprehensive regulatory framework to improve the schooling of individuals with disabilities. 20 U.S.C. § 1400, *et. seq.* IDEA and its regulations, 34 C.F.R. §§ 300. 1, *et seq.,* provide procedural and substantive standards to educate students with disabilities. 20 U.S.C. § 1401(d). IDEA requires that states implement a policy that provides disabled children with a free appropriate public education ("FAPE") in order to receive federal financial assistance. 20 U.S.C. § 1412(a)(1). California has adopted a federally approved state plan and enacted statutes and regulations to comply with IDEA requirements. *See* Cal. Educ. Code, §§ 56000, *et seq.;* Cal. Code Regs., Tit. 5, §§ 3000, *et seq.*; *See also Morgan Hill Concerned Parents Assoc. v. California Dep't of Educ.*, No. 2:11-CV-3471-KJM-AC, 2013 WL 1326301, at *1 (E.D. Cal. Mar. 29, 2013). Each disabled student's instruction is based on an IEP, pursuant to 20 U.S.C. § 1414(d). *Morgan Hill*, 2013 WL 1326301, at *1.

IDEA requires that states and local education agencies establish procedural safeguards to ensure that qualified students receive their FAPE. 20 U.S.C. § 1415(a). Such procedural safeguards must include the opportunity for any party to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child." *Id.* § 1415(b)(6)(A); *See also Elk Grove Unified Sch. Dist. v. E.G.*, No. 2:15-CV-02312-TLN-KJN, 2019 WL 4318572, at *3 (E.D. Cal. Sept. 12, 2019). Upon the presentation of such a complaint, "the parents or the local educational agency involved in such complaint shall have an opportunity

United States District Court
Northern District of California

for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A); *See also Elk Grove*, 2019 WL 4318572, at *3.

In California, due process hearings under IDEA are conducted by the Office of Administrative Hearings ("OAH"), which is an independent state agency. *Elk Grove*, 2019 WL 4318572, at *3 (citing *Fairfield-Suisun Unified Sch. Dist. v. Cal. Dep't of Educ.*, 780 F.3d 968, 969 (9th Cir. 2015)). "A party dissatisfied with the outcome of a due process hearing may obtain further review by filing a civil action in state or federal court." *Fairfield-Suisun*, 780 F.3d at 969 (citing 20 U.S.C. § 1415(i)(2)(A)). At the district court, the party challenging the administrative decision bears the burden of persuasion on each claim challenged. *Pointe Educ. Servs. v. A.T.*, 610 F. App'x 702, 703 (9th Cir. 2015) (citing *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009)). In its review, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). *S.B. v. San Mateo Foster City Sch. Dist.*, No. 16-CV-01789-EDL, 2017 WL 4856868, at *12 (N.D. Cal. Apr. 11, 2017), *aff'd sub nom. Burnett v. San Mateo Foster City Sch. Dist.*, 739 F. App'x 870 (9th Cir. 2018). Thus "[t]hough the parties may call the procedure a 'motion for summary judgment' in order to obtain a calendar date from the district court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

"[C]omplete de novo review of the administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir.2007). So is "blind deference"— "the district judge must actually examine the record to determine whether it supports the ALJ's opinion." *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 n.1 (9th Cir. 2017). "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent.*

1    *Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Ultimately, the correct level of deference given is

2    a matter for the discretion of the Court. *S.B.*, 2017 WL 4856868, at *12 (citing *Gregory K. v.*

3    *Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).

4

5    **III.    DISCUSSION**

6        The Court will first address the level of deference due to the ALJ decision. The Court will

7    then turn to J.D.'s motion, followed by the District's motion.

8        **A.    Level of Deference**

9        A court may give greater deference to administrative findings that are "thorough and

10    careful." *S.B.*, 2017 WL 4856868, at *12 (citing *Wartenberg*, 59 F.3d at 891). The Court finds this

11    to be the case here. In *Wartenberg*, the Ninth Circuit explained how a district court judge should

12    proceed when reviewing such a record: "The hearing officer's report was especially careful and

13    thorough, so the judge appropriately exercised her discretion to give it quite substantial deference.

14    The judge made her own independent judgment that a preponderance of the evidence supported

15    the hearing officer's findings and conclusions, and so reached the same conclusions." 59 F.3d at

16    892.

17        The Court has closely reviewed the administrative record and the ALJ's thorough and

18    careful 42-page decision. AR 1347-88. The ALJ thoroughly summarized the evidence and relevant

19    legal framework and set forth in detail the evidence that supported his decision. The ALJ found in

20    favor of J.D. on some points, although he ultimately concluded that any errors were harmless, and

21    found that J.D. was no longer eligible for special education and related services in any category.

22    The District presented nine witnesses, AR 362, and 170 exhibits, AR 348-359. J.D. was offered

23    the same opportunity and chose to not to present any witnesses that could give an informed

24    opinion as to whether J.D. needed special education services, such as a speech therapist or any

25    similar professional. AR 361, 1356 ¶ 33. J.D.'s father testified and offered eleven exhibits AR

26    345-47, 1356 ¶¶ 32-33.

27        As one illustrative example of the ALJ's thoroughness, the ALJ considered but did not

28    give significant weight to a three-page report offered by J.D. from Susan Yost, a speech and

United States District Court
Northern District of California

7

United States District Court
Northern District of California

language pathologist, because her report suggested that the father "played an outsized role in the assessment, acting as Student's 'informant' during testing." AR 605-08, 1356 ¶¶ 34-35. Ms. Yost did not testify at the hearing, and Dr. Hernandez, the speech-language pathologist who assessed J.D. for the District, persuasively rebutted the methods used by Ms. Yost in her assessment of J.D in her testimony at the hearing. AR 1352-53, 1357 ¶¶ 37-38. The Court finds that the ALJ decision goes far beyond the "superficial plausibility" the Ninth Circuit warned against in *M.C.*, 858 F.3d at 1194 n.1, and *Timothy O. v. Paso Robles Unified School District.*, 822 F.3d 1105, 1123 (9th Cir. 2016). Thus, the Court, in its discretion, finds it appropriate to give substantial deference to the administrative findings here.

### B.  J.D.'s Motion

J.D. appeals the ALJ's decision on several grounds: lack of authority to conduct the due process hearing; procedural flaws resulting in a seven-month delay of his triennial review; the District's use of the severe discrepancy model to assess him; a failure to include his parents in the decision-making process; withheld education records; and the denial of an independent educational evaluation ("IEE") at the District's expense. *See* Pl.'s Mot. The Court finds that J.D. has not demonstrated that the ALJ lacked authority to hear the case or was incorrect in any of his findings.

#### i.  Burden of Proof

As an initial matter, J.D. argues throughout his brief that the District failed to meet its burden of proof in front of the ALJ. *See* Pl.'s Mot. These arguments are unavailing here—while it is true that the District, as the party seeking relief, had the burden of persuasion in front of the ALJ, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005), it is J.D. that must affirmatively carry the burden of persuasion here. *Pointe Educ. Servs*, 610 F. App'x at 703. Simply arguing the District did not adequately prove its case is insufficient.

#### ii.  Authority of ALJ

As a threshold issue, J.D. argues that the ALJ lacked authority to hear the case and therefore could not make the finding that the District could exit J.D. from special education. Pl.'s Mot. 5. Specifically, J.D. contends the ALJ lacked authority because the IEP team did not make an

eligibility determination prior to filing a due process complaint. *Id.* 4-7. The Court disagrees and finds that the District's Prior Written Notice, issued pursuant to 20 U.S.C. § 1415(b)(3), was sufficient to trigger a due process hearing in this case.

The IDEA requires that parents receive formal, written notice whenever the school district intends to change the identification, evaluation, or educational placement of their child. 20 U.S.C. § 1415(b)(3); *Timothy O.*, 822 F.3d at 1112. That notice must describe the action proposed by the agency, explain why the agency proposes to take the action, and identify the records or assessments that the agency used as a basis for its decision. 34 C.F.R. § 300.503(a) & (b). Both the school district and the parents have a right to initiate a due process hearing when "[t]here is a proposal to initiate or change the identification, assessment, or educational placement of the child or the provision of a free appropriate public education to the child." Cal. Educ. Code § 56501(a)(1). The hearing must be in front of an impartial hearing officer, and both parties have the right to counsel, present evidence, and confront, cross-examine, and compel the attendance of witnesses. 34 C.F.R. §§ 300.511, 300.512.

J.D. argues that the ALJ did not have the authority to render a decision after the due process hearing because J.D.'s IEP team never made a determination of eligibility. Pl.'s Mot. 4-7. J.D. cites to 34 CFR 300.306(a), which states, in relevant part, upon completion of the administration of assessments and other evaluation measures, a group of qualified professionals and the parent of the child determines whether the child is a child with a disability. 34 CFR 300.306(a). The regulation does not mention a due process hearing or any method for resolving disputes. This information is found elsewhere in the IDEA. *See Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*, 258 F. Supp. 3d 1114, 1118 (E.D. Cal. 2017). "As a condition of receiving federal funds, states must provide 'an opportunity for any party to present a complaint ... with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child....'" *Id.* (quoting 20 U.S.C. § 1415(b)(6)(A)). "If a state receives a complaint under this provision, the parents or the school district must be allowed 'an impartial due process hearing' before a state or local agency." *Morgan Hill*, 258 F. Supp. 3d at 1118. (citing 20 U.S.C. § 1415(f)(1)(A)). In California, the OAH

United States District Court
Northern District of California

1   conducts these hearings. *Fairfield–Suisun*, 780 F.3d at 969.

2        The District argues it complied with IDEA when it gave J.D.'s parents Prior Written

3   Notice, pursuant to 34 C.F.R. § 300.503, of the intent to change J.D.'s educational placement. Def.

4   Opp'n 6; AR 711-12. This court agrees. The District acknowledged at the hearing before this

5   Court that it would not have been proper to use a Prior Written Notice in lieu of attempting a team

6   eligibility determination at a meeting with J.D.'s father. The record amply shows that an IEP team

7   determination was not possible here, though, due to the actions of J.D.'s father. Juliet Ann Hamak,

8   J.D.'s engineering and chemistry teacher present at the May 17, 2018 IEP team meeting, testified

9   that J.D.'s father would not let Mr. Coleman and, especially, Dr. Uranga-Hernandez deliver their

10  assessments, as he constantly interrupted them. AR 1595:2-6. Ms. Hamak, who had been to

11  approximately ten prior IEP team meetings, said this meeting was like "nothing I've ever

12  experienced," made her feel "extremely uncomfortable" and noted that J.D.'s father "was trying to

13  bully people." AR 1595:2-6, 1604:5. Dr. Uranga-Hernandez testified that, despite J.D.'s father's

14  constant interjections, she was able to get through all but the final conclusions of eligibility in her

15  report. AR 1889:24-1891:2, 1891:25-1892:3. After J.D.'s father ended the second IEP team

16  meeting on December 4, 2018 without allowing the team to discuss eligibility, he sent an email the

17  District the next day informing everyone that all IEP team meetings would be on hold until his

18  pending federal and state complaints had been resolved. AR 934 Dr. Barbera Moore, Director of

19  Special Services for the District, then issued the Prior Written Notice on December 12, 2018. AR

20  711-12 (Prior Written Notice), 1529:25-1530:24. After reviewing the record, the Court agrees with

21  the ALJ that the IEP team was prevented from making an eligibility determination due to the

22  actions of J.D.'s father, and sufficient notice, as required by 20 U.S.C. § 1415(b)(3) and its

23  implementing regulations, was provided to the parents before the initiation of the due process

24  hearing.

25        While the state laws don't contemplate this exact scenario of a parent refusing to

26  cooperate, they do make it clear that a parent cannot unilaterally prevent a due process hearing by

27  refusing to work with the school district. *See* Cal. Educ. Code § 56501(a)(3) (stating that a due

28  process hearing can be initiated when the parent refuses to consent to an assessment of the child).

United States District Court
Northern District of California

1    Here, the reason the IEP team did not make an eligibility determination is because J.D.'s father

2    prevented them from doing so. On this basis, the Court finds that the District provided proper

3    notice before initiating the due process hearing, and the ALJ had the authority to hear the case.

### iii.   Delay in Instituting Triennial IEP Meeting

5    Next, J.D. argues that the ALJ erred when he determined that the District's seven-month

6    delay in instituting his triennial IEP meeting did not have any adverse effect. Pl.'s Mot. 4, 6-7; AR

7    1364 ¶ 74. J.D. does not cite any statutes or case law to support his argument. At the

8    administrative level, J.D. failed to identify any specific harm that came to him or his father from

9    the delay, and the ALJ found that the delay actually benefitted J.D. and his father because he

10    remained in special education longer than he would have otherwise. AR 1375 ¶ 26. J.D. has not

11    presented any additional evidence for this Court to consider.

12    Procedural flaws do not automatically require a finding of a denial of a FAPE. *W.G. v. Bd.*

13    *of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992), *superseded in*

14    *part by statute on other grounds*. In matters alleging a procedural violation, a hearing officer may

15    find that a child did not receive a FAPE only if the procedural inadequacies impeded the child's

16    right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-

17    making process regarding the provision of a FAPE to the parents' child, or caused a deprivation of

18    educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *see also* Cal. Educ. Code § 56505(f)(1) & (2).

19    The parties largely agree on the facts but disagree over the legal conclusions the ALJ drew

20    from them. J.D.'s triennial review was due in October 2017. AR 1374 ¶ 23; Pl.'s Mot. 4. The

21    District had begun the triennial assessment process in May 2017 by giving J.D.'s father an

22    assessment plan that he did not return until October, according to the testimony of Cynthia Perez,

23    a special education teacher and the case manager for J.D.'s IEP team. AR 1374 ¶ 25; 2546:9-21,

24    2681:17-21. California law requires that an assessment be completed, and an IEP team meeting

25    held to discuss it, within 60 days of the district's receipt of a signed assessment plan. Cal. Educ.

26    Code § 56344(a). As the ALJ found, the assessment should have been completed, and the meeting

27    should have been held, by December 11, 2017. AR 1374 ¶ 22.  Mr. Coleman did not complete and

28    distribute his final report until February 26, 2018, well outside the 60-day window. AR 490, 1363

United States District Court
Northern District of California

¶ 72. Dr. Hernandez did not complete her assessment until February 2018, so the District scheduled an IEP team meeting for March 29, 2018, to discuss both reports. AR 1363 ¶ 73. J.D.'s father cancelled the meeting. AR 1363 ¶ 73. The meeting finally occurred on May 17, 2018. AR 1363 ¶ 73.

The ALJ found that both parties were partially responsible for the delay. AR 1374 ¶¶ 23-24. The ALJ found that the District was correct to wait five months for the father to return the assessment plan he received in May 2017, thus ensuring that the triennial review would not occur on time—"the Ninth Circuit has held that a district forced to choose between statutory timelines and parental participation should favor the latter." AR 1374 ¶ 25 (citing *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1046 (9th Cir. 2013)). The Ninth Circuit has also held that "delays in meeting IEP deadlines do not deny a student a FAPE where they do not deprive a student of any educational benefit." *Id.* (citing *A.M. v. Monrovia*, 627 F.3d 773, 779 (9th Cir. 2010) ("Whether or not Defendant exceeded the thirty-day limit, A.M. suffered no deprivation of educational benefit and therefore has no claim.")). As the ALJ found here, the delay did not harm J.D. and his father because it allowed J.D. to remain in special education longer than he would have otherwise. AR 1364 ¶ 74. The Court agrees with this conclusion and finds that the District's delay did not deprive J.D. of any educational benefit.

### iv.       District's Use of Severe Discrepancy Model

J.D. argues that the ALJ did not have the authority to find that he was ineligible under the specific learning disability category since Mr. Coleman only used the severe discrepancy model in his assessment. Pl.'s Mot. 8-10. While a state cannot require a local educational agency to use only the severe discrepancy model, a school district still has the discretion to use this model non-exclusively, should it so choose. *S.B.*, 2017 WL 4856868, at 9 n.10. (citing *M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 853 (9th Cir. 2014)). After reviewing Mr. Coleman's testimony and his report at AR 1272-1321, the Court accepts the ALJ's finding that Mr. Coleman was a credible witness and the ALJ's decision to give his findings significant weight because the ALJ was able to assess the content of his testimony and the demeanor of the witness while he testified. AR 1357 ¶¶ 40-53, 1377 ¶ 34. After reviewing Mr. Coleman's report and testimony, the Court finds that Mr. Coleman

12

did not base his recommendation that J.D. was not eligible for special education on a single measure, as J.D. claims. Mr. Coleman relied on multiple sources for his conclusion. AR 1376 ¶ 32.

J.D.'s citation to *Michael P. v. Department of Education*, 656 F.3d 1057, 1067 (9th Cir. 2011) is inapposite here. In *Michael P.*, the Ninth Circuit found that the Hawaii Department of Education could not require local education agencies to use the severe discrepancy model. *Id.* at 1067. That is not the same, though, as holding a school district cannot use the severe discrepancy model, and subsequent Ninth Circuit case law confirms that schools can, in fact, use it. See *M.M.*, 767 F.3d at 853. ("Here, although the District had the choice, it used the severe discrepancy model for C.M.'s initial evaluation.") Like in *M.M.*, this record shows that the District used a variety of assessment tools. Accordingly, the Court finds that J.D. has failed to meet his burden to establish that the District was wrong to use the severe discrepancy model as a part of the assessment.

### v.   Adequacy of Parent Participation

J.D. challenges the ALJ's finding that his parents were properly included in the decision-making process. Pl.'s Mot. 10-12. The primary basis for this challenge is the seven-month delay in commencing J.D.'s triennial review. J.D. cites *Doug C.*'s holding that only procedural inadequacies resulting in the loss of educational opportunity or seriously infringe on the parents' opportunity to participate in the IEP formulation process result in the denial of a FAPE. 720 F.3d at 1043; Pl.'s Mot. 11. The Court has already addressed the delay and found that it did not constitute a denial of a FAPE. The Court also agrees with the ALJ's finding that J.D.'s parents were given a meaningful opportunity to participate in the IEP process, and J.D.'s father took full advantage of that opportunity. By J.D.'s own admission, "Parent was assertive, he was committed to speaking on the interests of his son, he made written complaints and requests that his own needs and scheduling be accommodating, but he was not violent nor threatening and he was present at every IEP team meeting." Pl.'s Mot. 6. The Court has no trouble finding that J.D.'s father was included in the decision-making process.

J.D. also argues that the District staff present at the December 2018 IEP were not knowledgeable enough about the process, and this denied his parents meaningful participation. Pl.'s Mot. 12. J.D. has provided no evidence that speaks to the qualifications of the District staff

present at the December 2018 IEP team meeting. J.D. cites no statutes or case law to support his argument, and the Court does not find this argument relevant to his claim of parent participation. Accordingly, the Court finds that J.D.'s parents were given a meaningful opportunity to participate in the IEP process.

### vi.    Educational Records Allegedly Withheld by the District

J.D. accuses the District of failing to comply with his father's request for records and alleges that the District could not legally hold IEP meetings or proceed to a due process hearing without producing the records first. Pl.'s Mot. 11-12.

Under California Education Code § 56504, "[t]he parent shall have the right and opportunity to examine all school records of his or her child and to receive copies pursuant to this section and to Section 49065 within five business days after the request is made by the parent, either orally or in writing." Cal. Educ. Code § 56504. "An 'education record' under IDEA is defined by the regulations implementing the Family Educational Rights and Privacy Act ('FERPA')." *Burnett*, 739 F. App'x at 873 (citing 34 C.F.R. § 300.611(b)). "Under FERPA, an education record includes records, files, and documents that '(i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.'" *Burnett*, 739 F. App'x at 873 (quoting 20 U.S.C. § 1232g(a)(4)(A)). The Supreme Court has interpreted the word "maintained" in FERPA as meaning "to keep in existence or continuance; preserve; retain" and reasoned that "[t]he word 'maintain' suggests FERPA records will be kept in a filing cabinet in a records room at the school or on a permanent secure database." *Owasso Indep. Sch. Dist. No. I-011 v. Falvo,* 534 U.S. 426, 432-33 (2002).

J.D.'s counsel requested records on January 23, 2019. AR 363-366. In response, the District produced approximately 1,800 pages of records and sent J.D.'s counsel a list of everything produced. AR 413-17. The District admits that one five-page document and one IEP document that was no more than six pages were inadvertently produced later than the bulk delivery. Def.'s

United States District Court
Northern District of California

1    Opp'n 12 n.2.[2] Dr. Moore, the Director of Special Services for the District, testified about the

2    record-keeping process. AR 2887-2893. Her unrefuted testimony established that any records not

3    in J.D.'s file, such as the two documents specifically cited by J.D., were inadvertently not

4    maintained in the file and not deliberately withheld. Further, Dr. Moore testified that she had

5    given J.D.'s father or his lawyers the file on multiple occasions. *See id.* By his own admission,

6    J.D. was provided with the approximately eleven pages of documents at the hearing, Pl.'s Mot. 11,

7    and the ALJ noted that the late production of the IEP document in particular had no practical

8    consequence. AR 1381 ¶ 48. J.D. fails to identify any specific harm caused by this delayed

9    production.

10        The other document J.D. claims was withheld was the 122-page protocol used by Dr.

11   Uranga-Hernandez in her assessment. Pl.'s Mot. 11. This was also produced at the hearing, at a

12   time when J.D. could have recalled Dr. Uranga-Hernandez to question her about the protocol.[3] *Id.*

13   The questions surrounding the employment status of Dr. Uranga-Hernandez complicated this

14   request: If she was an independent contractor, the District would not have maintained her

15   protocols in its system of records. AR 291. Ultimately the ALJ did not resolve the question of

16   whether Dr. Uranga-Hernandez was properly considered a district employee or an independent

17   contractor because that determination had no effect on the outcome of the decision. AR 1349.

18   Again, J.D. fails to identify any specific harm as a result of the delay in receiving this document.

19        The Ninth Circuit's *Burnett v. San Mateo Foster City School District* is illustrative here.

20   739 F. App'x 870. In *Burnett*, Plaintiffs argued that the school district committed a procedural

21   violation when it only turned over emails concerning S.B. that had been printed and added to

22   _____

23   [2] The District identifies the IEP document as the May 17, 2018 IEP document. Def.'s Opp'n 12
     n.2. However, based on J.D.'s motion and the underlying administrative record, it appears the
24   correct document is the May 12, 2017 IEP document, AR 432-435. *See* Pl.'s Mot. 11; AR 288-
     292, 1380 ¶¶ 45-48. The May 12, 2017 document is only four pages long, and the delayed
25   production did not prevent J.D.'s counsel from using it extensively in witness examination at the
     due process hearing. AR 1381 ¶ 48.
26   [3] J.D.'s assertion that he would have to fund the transportation of Dr. Uranga-Hernandez if he
     recalled her as a witness misstates the record. Pl.'s Reply 9, ECF 73; AR 1895-1899. Dr. Uranga-
27   Hernandez was on J.D.'s witness list as well as the District's list, and the issue of who would
     potentially pay for her transportation was explicitly left open. *Id.* The Court and the District both
28   agreed to stay later on the day this issue was raised, until six or seven p.m., in order to
     accommodate J.D. *Id.*

United States District Court
Northern District of California

S.B.'s physical file. *Id.* at 873. The Ninth Circuit found that, "Since the District turned over the emails it 'maintained' as part of a student's educational records, we agree with the district court that in responding to the Burnetts' request for a copy of S.B.'s education records, it did not commit a procedural violation." *Id*. at 873-74. The situation is similar here. The District turned over all the records it maintained in J.D.'s physical file. The May 2017 IEP was inadvertently never added to the file amidst the end-of-the-school-year preparations, and since the District assumed Dr. Uranga-Hernandez's report was an IEE, her protocol was not maintained in the file either. The District's failure to produce these files immediately did not result in an actionable procedural violation.

### vii.    J.D.'s right to an Independent Educational Evaluation

Finally, J.D. argues that he is entitled to an IEE. Pl.'s Mot. 13-15. J.D. argues the District violated his FERPA rights by giving his records to Dr. Uranga-Hernandez, whom J.D. identifies as not being employed by, or subject to the control of, the District. Pl.'s Mot. 13. At the same time, he claims he is entitled to an IEE because Dr. Uranga-Hernandez is an employee of the district, and therefore her assessment cannot be an IEE. Pl.'s Mot. 14. J.D. does not acknowledge the inherent contradiction in his arguments.

Additional background is appropriate here. In 2017, J.D.'s father insisted that his son's speech and language assessment be performed by a bilingual speech pathologist, and he requested that the District select one from its staff but not one from Mt. Pleasant, J.D.'s  high school in the District. AR 1351 ¶¶ 11-12. The District initially denied the request since J.D. was fluent in English with no discernible need for an assessment in Spanish. *Id.* ¶12. The District eventually agreed to a bilingual assessment, without specifying whether it was a district assessment or an IEE. *Id.* At the hearing, Dr. Moore testified that there were no bilingual speech and language pathologists on the Special Education Local Planning Area (SELPA) list of independent assessors, and the only such professionals she knew of in the area were employed by the District. AR 1351-52 ¶ 13. The ALJ found her to be a credible witness who gave careful, specific, and detailed testimony that showed no weakness during extensive cross-examination. AR 1352 ¶ 14. Dr. Moore, who is a speech-language pathologist herself, was professionally acquainted with Dr.

1    Uranga-Hernandez, a professor at Biola University. *Id.* ¶ 15. Dr. Uranga-Hernandez agreed to do

2    the bilingual assessment. *Id.*

3         Both Dr. Moore and Dr. Uranga-Hernandez believed the assessment was an IEE. AR 1352

4    ¶ 14. Indeed, Dr. Uranga-Hernandez's report was titled IEE. AR 466. Dr. Uranga-Hernandez

5    testified that Dr. Moore asked her if she was available to do an IEE. AR 1831:6-17. However, the

6    ALJ agreed with J.D. and found that the preponderance of the evidence supported J.D.'s argument

7    that Dr. Uranga-Hernandez's assessment was a district assessment and not an IEE. AR 1373 ¶ 20.

8    This was the first time the District had assessed J.D.'s speech and language needs, and if the initial

9    assessment was an IEE, that would have prevented J.D.'s father from disagreeing with the result

10   and obtaining an IEE as a result. *Id.* The ALJ also found the fact that the District did not obtain a

11   written waiver of J.D.'s privacy rights to allow Dr. Uranga-Hernandez access to his education

12   records supportive of the finding that the assessment was not an IEE. *Id.* The ALJ did not make a

13   determination regarding Dr. Uranga-Hernandez's employment status as either a district employee

14   or an independent contractor since it has no effect on the outcome of the decision. AR 1349. The

15   ALJ found that any inquiry into Dr. Uranga-Hernandez's employment status for any reason not

16   related to special education was outside his jurisdiction. *Id.*

17        The ALJ found that Dr. Uranga-Hernandez's report, as a district assessment, complied

18   with the applicable federal and state statutes and regulations. AR 1378 ¶¶ 35-36. Dr. Uranga-

19   Hernandez evaluated J.D. on February 7, 8, and 9, 2018, spending one full day with him and then

20   one additional morning and afternoon over two days. AR 1353 ¶ 19. The ALJ detailed the

21   assessments Dr. Uranga-Hernandez used in her evaluation, the records she reviewed, and the

22   interviews she conducted, including one with J.D.'s parents. AR 1353-54 ¶¶ 20-25. Dr. Uranga-

23   Hernandez testified at the hearing, and the ALJ described her testimony as "careful, specific, and

24   detailed, and no weaknesses in it emerged during extensive cross-examination." AR 1352 ¶ 14;

25   1817-1972 (hearing testimony). Her testimony was given significant weight. AR 1352 ¶ 14 J.D.

26   raised his FERPA violation claim in front of the ALJ, but the ALJ determined that was not a

27   question over which he had jurisdiction, and such a violation would not affect the appropriateness

28   of Dr. Uranga-Hernandez's assessment for the purpose of evaluating whether her assessment was

United States District Court
Northern District of California

1  appropriate and legally compliant as a triennial assessment. AR 1379 ¶ 39.

2        The Court has reviewed the administrative record and agrees with the ALJ that Dr.

3  Uranga-Hernandez's assessment was not an IEE. The District contracted with Dr. Uranga-

4  Hernandez to provide a speech-language assessment and paid her $5,500 to do so. AR 1218-19,

5  1834-35. Since the District had never previously provided J.D. a speech-language assessment, Dr.

6  Uranga-Hernandez's evaluation was not an IEE. Regardless of her employment status, J.D.'s

7  FERPA claim must fail, as FERPA does not contain a private right of action. *Kwong v. Dynasty*

8  *Properties, LLC*, No. 17-CV-04966-CRB, 2017 WL 4470791, at *5 (N.D. Cal. Oct. 6, 2017)

9  (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002) ("[T]here is no question that FERPA's

10  nondisclosure provisions fail to confer enforceable rights.")).

11        In order to obtain an IEE, a parent must disagree with an evaluation obtained by the public

12  agency and then request an IEE. 34 C.F.R. § 300.502(b)(1). The predicate District evaluation had

13  not yet occurred and thus any work done by Dr. Uranga-Hernandez could not legally have been

14  deemed an IEE. Further, when a student requests an IEE, the public agency must, without

15  unnecessary delay, either file a request for due process hearing to show that its assessment is

16  appropriate or ensure that an IEE is provided at public expense. 34 C.F.R. § 300.502(b)(2); Cal.

17  Educ. Code § 56329(c). The Court finds that the District complied with these requirements by

18  filing a due process complaint, and the ALJ correctly found that the District's assessments were

19  appropriate. J.D. carries the burden of persuasion in front of this Court, and he has not shown that

20  he was entitled to an IEE.

21        **viii.   Conclusion**

22        The Court finds that J.D. has failed to prove by a preponderance of the evidence that the

23  ALJ's decision should be overturned for any reason. Accordingly, the Court DENIES his motion

24  for summary judgment.

25        **C.   District's Motion**

26        The District has brought a motion for summary judgment to affirm the ALJ's decision. *See*

27  Def.'s Mot. Specifically, the District seeks affirmance of three points: The ALJ's conclusion that

28  J.D. no longer qualified for special education under any category was supported by the evidence;

United States District Court
Northern District of California

the ALJ properly decided that J.D.'s parents were given the opportunity to meaningfully participate in the December 4, 2018 IEP meeting; and the ALJ's decision that the triennial assessments of Mr. Coleman and Dr. Uranga-Hernandez were appropriate, and therefore J.D. was not entitled to an IEE, was supported by the evidence. *Id.* The Court has already addressed the meaningful participation claim and found that the ALJ's decision was supported by the evidence.

###### i.    Dr. Uranga-Hernandez's Bilingual Speech and Language Assessment

A district must ensure that a child is assessed in all areas related to a suspected disability. 20 U.S.C. § 1414(b)(3)(B). A school district must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent" *Id.* § 1414(b)(2)(A). The assessments must be administered by trained and knowledgeable personnel. *Id.* § 1414(b)(3)(A)(iv).  The assessment of Dr. Uranga-Hernandez has met that criteria here.

The Court reviewed the ALJ's findings regarding Dr. Uranga-Hernandez's assessment above. The Court has independently reviewed her full testimony at the due process hearing on March 20, 2019, and her written report. AR 466-481 (written report), 1817-1972 (hearing testimony). She testified that she met with J.D.'s parents before the assessment, and they were initially excited she had been selected to do it. AR 1836:18-21. Dr. Uranga-Hernandez reviewed all of J.D.'s available education records. AR 1837:17-19. She interviewed both of J.D.'s parents and continued to correspond via email with J.D.'s father after the interview. AR 1837:19-21. She sent questionnaires to J.D.'s teachers, and she interviewed a teacher and his case manager. AR 1837:21-23. Dr. Uranga-Hernandez observed J.D. in the classroom. AR 1827:23-24. And she did several standardized assessments with J.D. AR 1837:24-25. She reviewed documentation J.D.'s father provided her about a potential autism diagnosis and noted that the provider stated it was not a definitive determination. AR 1839:20-1840:3. Dr. Uranga-Hernandez also noted that another medical report provided by J.D.'s father also stated that the provider did not believe J.D. was on the autism spectrum and declined to assign him an ADHD diagnosis, too. AR 1841:8-19. She noted in her review of J.D.'s records that he had made significant progress academically during the past 10 years. AR 1841:20-1847:4.

United States District Court
Northern District of California

1    For standardized tests, Dr. Uranga-Hernandez utilized the CELF-5, the Clinical Evaluation

2    of Language Fundamentals; the CELF-4, the Spanish-language edition; the CASL, the

3    Comprehensive Assessment of Spoken Language; and two vocabulary tests. 1847:7-1863:4. She

4    explained each test and scoring procedure in detail and testified to the insights she gained from

5    each test. *Id.* For example, Dr. Uranga-Hernandez noted that J.D.'s above-average score on the

6    part of the CASL that tests an understanding of nonliteral language, such as sarcasm, would

7    suggest that he is not autistic, because children with autism have a very difficult time

8    understanding nonliteral language.  AR 1859:10-1861:19.

9    Dr. Uranga-Hernandez included all her findings in a sixteen-page report. AR 466-481. She

10   summarized her interviews and communications with J.D.'s parents; Mrs. Perez, his case

11   manager; Ms. Chen, who consulted with J.D. 30 minutes each month as part of his IEP; Mr.

12   Lovato, his English teacher; Mr. Busby, his math teacher; Mr. Jenson, his band teacher; and Mrs.

13   Hamak, his chemistry and engineering teacher. AR 469-472. Dr. Uranga-Hernandez also detailed

14   her classroom observation periods and her evaluation of J.D.'s written work. 472-473.

15   At the hearing, J.D.'s counsel had a full opportunity to cross-examine Dr. Uranga-

16   Hernandez, and no serious flaws emerged in her testimony. AR 1915-1966, 1971-1972.

17   After reviewing the testimony and report of Dr. Uranga-Hernandez, the Court agrees the

18   ALJ's finding that Dr. Uranga-Hernandez's report was appropriate.

19       **ii.    Mr. Coleman's Physcoeducational Assessment**

20   Mr. Coleman interviewed both J.D. and his father as part of his evaluation, and used a

21   variety of assessments and tests, as detailed by the ALJ in the record. AR 490-539, 1358 ¶¶ 42-52.

22   The ALJ found his assessment "detailed and specific." AR 1360 ¶ 53.  Mr. Coleman also testified

23   at the hearing, and the ALJ found him a credible witness and gave his opinions significant weight.

24   AR 1360 ¶ 53. The ALJ found that Mr. Coleman's report complied with the requirements of all

25   applicable federal and state laws. AR 1375 ¶ 28. Accordingly, the ALJ found that J.D.'s father was

26   not entitled to an IEE of J.D. at the District's expense. AR 1377 ¶ 34. J.D. does not contest the

27   District's assertion regarding the appropriateness of Mr. Coleman's assessment in his opposition

28   brief.

1     The Court has independently reviewed Mr. Coleman's full testimony at the due process

2  hearing on March 21 and 26, 2019, and his written report. AR 1272-1321 (written report), AR

3  2206-63, 2289-2322, 2326-2441 (testimony). Mr. Coleman assessed whether or not J.D. had an

4  educational disability in four categories: 1) specific learning disability, 2) emotional disturbance,

5  3) "other health impaired," and 4) autism, and he also assessed whether J.D. needed educationally

6  related mental health services. AR 2224:14-17. To do this, Mr. Coleman used several standardized

7  assessments of reasoning, memory, information processing, phonological processing, visual

8  processing, verbal learning, rating scales, exploring autism, adaptive behavior, social- emotional

9  functioning, developmental history, and a parent questionnaire completed by J.D.'s father. AR

10  2224:20-25. A full list of the procedures and tests used can be found in Mr. Coleman's written

11  report. AR 1273. Mr. Coleman also interviewed J.D. and twice interviewed J.D.'s father. AR

12  2224:25-2225:2. J.D. completed a questionnaire as well and underwent a mental status review. AR

13  2225:2-4. J.D.'s father completed a parent executive functioning inventory. AR 2225:4-5. Mr.

14  Coleman observed J.D. in chemistry class and reviewed his educational records. AR 2225:5-9. He

15  also sought input from J.D.'s teachers. AR 2225:10-13.

16     To highlight a few instruments used, Mr. Coleman used the WISC-5 IQ test on J.D., and

17  J.D. scored in the average range in terms of his full scale IQ with no significant deficits in any of

18  the index areas. AR 2246:15-21. He also used the CTOPP, which is a test of phonological

19  processing. AR 2248:23-25. The assessment showed at least average range functioning in

20  phonological processing. AR2249:7-8. Mr. Coleman reviewed adaptive behavior scales completed

21  by J.D.'s father and his teachers. 2249:13-15. The teachers did not express any concern in the area

22  of adaptive behavior. AR 2249:17-18. However, J.D.'s father's answers on the scale were all

23  significantly below the answers from the teachers. AR 2249:15-18. Some of J.D.'s father's

24  answers seemed implausible for a teenager as highly functioning as J.D., in Mr. Coleman's

25  view— for example, J.D.'s father expressed some concerns about toileting and wiping up his own

26  spills that Mr. Coleman said seemed "to simply not to be possible concerns for this young man."

27  AR 2250:1-3.

28     Mr. Coleman did note that J.D. became frustrated with one attention-related test on a

21

laptop. AR 2251:17-2253:13. Mr. Coleman stated that J.D. started the test too fast and became confused and visibly frustrated, with a red face and clenched fist. *Id.* Upon cross-examination, Mr. Coleman explained that this was very typical behavior for a child who becomes confused during this assessment. AR 2365:14-16. J.D.'s counsel did have a full opportunity to cross-examine Mr. Coleman at the hearing, and no serious flaws emerged in his testimony. AR 2347-2404, 2433-41.

Mr. Coleman's written report notes that J.D. was assessed on four different dates in October and November 2017. AR 1273. His classroom observation occurred on February 13, 2018. *Id.* Mr. Coleman interviewed J.D.'s father on November 13, 2017 and January 22, 2018. *Id.* Mr. Coleman also included statements from J.D.'s teachers in his written report. AR 293. For example, the band teacher said the following: "[J.D.] is a great student. He is a capable saxophonist, obviously through years of practice. He comes to class prepared, with all his materials, having practiced them ready to play. He gets along well with his peers and could easily be a section leader one day." *Id.* Mr. Coleman concluded that J.D. has average range intellectual functioning overall. AR 1312. He also concluded that J.D. did not need specialized academic instruction since his educational needs appeared to be met within the general education environment. AR 1317-18. Mr. Coleman then concluded that J.D. did not meet the eligibility criteria for special education in the categories of specific learning disability, emotional disturbance, other health impairment, or autism. AR 1318-1321.

After reviewing the record and the ALJ decision, the Court agrees with the ALJ that Mr. Coleman's assessment was legally complaint and finds the J.D. is not entitled to an IEE at the District's expense.

### iii.    ALJ's conclusion that J.D. no longer qualified for special education under any category

Finally, with regard to J.D.'s eligibility for special education in any category, the ALJ noted that no professional testified that J.D. was eligible for any reason. AR 1348. The ALJ went through the legal requirements for several different special education categories: language or speech disorder (AR 1381-83 ¶¶ 50-57); autism (AR 1383-85 ¶¶ 58-63); other health impairment

(AR 1385 ¶¶ 64-67); specific learning disability (AR 1386 ¶¶ 68-70); and emotional disturbance (AR 1387-88 ¶¶ 71-73). The ALJ meticulously described the applicable statutes and regulations and applied the facts to the law, addressing arguments presented by both parties. In addition to the testimony of Dr. Moore, Dr. Uranga-Hernandez, and Mr. Coleman, the ALJ heard testimony from Trinnie Calabrese, J.D.'s speech and language therapist (AR 1726-1767); Julia Hamak (AR 1544-1641), who taught J.D.'s chemistry and engineering classes; and Aaron Jenson, J.D.'s band teacher (AR 1642-1699). AR 1355 ¶¶ 27-30. Dr. Uranga-Hernandez contacted all of J.D.'s teachers as part of her assessment, and all of them stated that J.D. had no speech or language difficulties in their classes. *Id.* ¶ 31.

As the Court previously noted, the ALJ found the testimony of Mr. Coleman and Dr. Uranga-Hernandez credible. AR 1352 ¶ 14; 1360 ¶ 53. J.D. did not present any witnesses of his own, other than his father, and the reports he submitted were reasonably discounted in favor of the District's reports by Mr. Coleman and Dr. Uranga-Hernandez, who both testified in person and were available for cross-examination. Both Mr. Coleman and Dr. Uranga-Hernandez successfully attacked the credibility of J.D.'s reports in their assessments and testimony. AR 1899:25-1911:15 (discrediting 2018 speech and language assessment showing language and speech disorder); 2228:13-2230:13 (establishing 2006 assessment of possible autism was not a definitive diagnosis and suggesting alternate conclusions to draw from J.D.'s behavior); 2334:10-2341:18 (discrediting 2018 diagnosis of autism that occurred in the same appointment as the initial evaluation with the father present).

J.D. raises several issues with the ALJ's determination that he was no longer eligible for special education. *See* Pl.'s Opp'n, ECF 70. The Court finds none of them meritorious. J.D. first argues that while the ALJ properly found that the District committed procedural violations that led to the delay in his triennial assessment, the ALJ drew the wrong conclusion when he found that the delay actually benefitted J.D. because he was able to stay eligible for special education longer than he would have without the delay. Pl.'s Opp'n 1, 7. J.D. cites to *L.J. v. Pittsburgh Unified School District*, 850 F.3d 996 (9th Cir. 2017), but the Court does not find this case analogous. In *L.J.*, the district court had found that L.J. was disabled under three categories as defined by IDEA

but nonetheless was not eligible for special education services because of his satisfactory

performance in general education classes. 850 F.3d at 999. Here the ALJ found that J.D. was not

eligible for special education services under any category. And *L.J.* reiterates that "[n]ot all

procedural violations constitute a denial of a FAPE." *Id.* at 1003 (citing *R.B. v. Napa Valley

Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007)). "A child is denied a FAPE when procedural

inadequacies result in the loss of an educational opportunity, or seriously infringe on the parents'

opportunity to participate in the IEP formulation process." *L.J.*, 850 F.3d at 1003 (citing *Doug C.*,

720 F.3d at 1043). Here, J.D. has not identified any educational opportunity he lost as a result of

the delayed triennial meeting. As the ALJ found, and this Court confirmed after a review of the

record, the delay resulted in J.D. retaining the special education services his father wanted for him

longer than he would have otherwise. This is not the loss of an educational opportunity.

Next, J.D. argues that the ALJ did not consider that J.D.'s special education services were

allowing him to be successful in general education classes. Pl's Opp'n 2. The Ninth Circuit uses

the "snapshot" rule, which instructs the court to judge the appropriateness of the eligibility

determination on the basis of the information reasonably available to the parties at the time of the

IEP meeting. *L.J.*, 850 F.3d at 1004. The District has identified evidence in the record indicating

that J.D.'s IEP team has always taken his existing accommodations into account when assessing

him. AR 434 (May 12, 2017 IEP meeting); 457 (Oct. 18, 2017 meeting). More importantly, the

IEP considered J.D.'s existing accommodations during the two triennial review IEP team

meetings. AR 580, 705. Further, teachers testified that the accommodation J.D. mentions

specifically in his brief—the ability to retake tests—was offered to all students, not just special

education students. AR 1570:18-25. Teachers allowed all students extra time to complete work as

well. AR 1559:5-18. The ALJ also noted J.D.'s accommodations in his decision as well. AR 1351

¶ 10; 1355 ¶ 27-28. Based on this Court's review of the record, the Court finds that J.D.'s existing

accommodations were considered at the time of his eligibility determination. J.D. also argues that

the District failed to consider how J.D.'s needs would be met without the accommodations that

J.D. claims were sustaining his high grade point average. Pl.'s Opp'n 3. J.D. has not identified any

statutes or case law, and this Court is not aware of any, that require IEP teams to explicitly address

United States District Court
Northern District of California

24

United States District Court
Northern District of California

1   this counterfactual scenario. The Court finds that the IEP team and ALJ properly took into

2   consideration J.D.'s accommodations when assessing his eligibility for special education and

3   finding that he no longer qualified for special educations services, thus fulfilling their obligation

4   with regards to his then-existing accommodations.

5       J.D. also argues that the District failed to document the accommodations provided to J.D.

6   Pl.'s Mot. 3. The Court finds this argument without merit. The ALJ was able to provide a full

7   rendition of the accommodations in J.D.'s IEP, which means the documentation necessarily

8   existed. AR 1350 ¶ 8. Additionally, the Court finds no statute or regulations—and J.D. has not

9   identified any—that requires teachers to document when accommodations are used and when they

10  are not. *See* 34 CFR § 300.320. Accordingly, the Court finds no issue with the documentation of

11  J.D.'s accommodations.

12      J.D. again argues in his opposition brief that the school District withheld records from his

13  counsel. Pl.'s Opp'n 5. The Court addressed this argument previously. Approximately twelve

14  pages of school records were produced late to counsel, and the 122-page protocol used by Dr.

15  Uranga-Hernandez was not maintained by the school because the school assumed her report was

16  an IEE. It was eventually produced. The District's failure to produce these files immediately did

17  not result in an actionable procedural violation.

18      J.D. next argues that the CDE found that the District was out of compliance and failed to

19  provide J.D. with the services identified in his IEP. Pl.'s Opp'n 5. The District does not address

20  this argument. The Court has reviewed the record and finds that J.D.'s father submitted a

21  complaint to CDE on November 6, 2018. AR 402. One of the issues raised by J.D.'s father in the

22  complaint was that the District failed to provide J.D. with his speech and language services during

23  the 2017-18 school year. AR 405-406. The CDE found that J.D.'s IEP allowed him 30 minutes per

24  month of language and speech consultation. AR 405. The CDE found that, during the investigation

25  period from November 6, 2017, to May 24, 2018, J.D. was entitled to receive 210 minutes of

26  speech and language services. AR 406. However, the CDE found that J.D. had only received 145

27  minutes of speech and language therapy during the relevant time period. AR 406. The District was

28  required to provide J.D. with sixty-five minutes of compensatory speech and languages services as

a corrective action. AR 407. J.D. attempts to link this finding to his argument regarding the District's alleged withholding of educational records. Pl.'s Opp'n 6. The Court does not see how this procedural violation by the District relates to the issues in front of the ALJ, namely, whether J.D. still qualified for special education services in any category. The Court agrees with J.D. that the IDEA procedural regulations are important. In litigation, though, only procedural violations that result in the denial of a FAPE are actionable in Court. *L.J.*, 850 F.3d at 1003. The Court does not find that this procedural violation rises to this level.

J.D. argues that his father made reasonable scheduling requests regarding the IEP team meetings. Pl.'s Opp'n 6. J.D.'s father first highlights the final scheduling issue between the parties. *Id.* On Friday December 21, 2018—after J.D.'s father prematurely ended the December 8, 2018 IEP team meeting and informed the District that he would not be attending any further IEP team meetings until all his outstanding complaints were resolved—the District sent a notice of a IEP team meeting on January 16, 2019. AR 727, 729. J.D.'s father rejected that date on January 11, 2019, AR 949-950, and the District filed its request for a due process hearing that same day. AR 1347. The District submitted as evidence a detailed, eight-page document identifying all the IEP team meetings J.D.'s father cancelled between April 2017 and March 2018. AR 1149-1156. J.D. cites California Education Code 56504 to support his argument that the District is required to respond to reasonable requests, but this statute only pertains to school records production, not to scheduling obligations of the District. The Court has reviewed the record and finds that the District did not commit a violation with regards to its scheduling of IEP team meetings.

J.D. raises another argument this Court has previously addressed in detail regarding the need for the IEP team to make a determination of eligibility. Pl.'s Opp'n 7-9. For reasons the Court has already explained in depth, J.D.'s father was given a meaningful opportunity to participate in the IEP team process, and when the team was unable to make an eligibility determination due to the actions of J.D.'s father, the District properly sent J.D.'s father a Prior Written Notice before initiating a request for a due process hearing.

Finally, J.D. argues that he did not consent to the speech and language assessment performed by Dr. Uranga-Hernandez. Pl.'s Opp'n 9. Emails from J.D.'s father to the District tell a

different story. In a November 29, 2017 email from J.D.'s father to Dr. Moore and Mrs. Perez, J.D.'s father writes,

> I like to thank you all for approving the Bilingual SLP assessments, I have inform my son [J.D.] that he got approved and the school district authorized Dr. Yvana Uranga-Hernandez PhD-Bilingual SLP to perform the Bilingual SLP assessments. We request to coordinate with Dr. Yvana Uranga-Hernandez to schedule the assessments during [J.D.'s] 6th & 7th classroom periods…

AR 1222. Further, Dr. Uranga-Hernandez testified that the hearing that J.D.'s father was initially excited she had been selected to perform the assessment. AR 1836:18-21. There is no evidence in the record (and indeed, all evidence is to the contrary) that J.D. never consented to the assessment by Dr. Uranga-Hernandez.

After conducting its own independent review of the record, the Court finds that the ALJ's decision regarding J.D.'s eligibility for special education services was supported by a preponderance of the evidence. Accordingly, because the Court finds that the ALJ's decision was proper, the Court GRANTS the District's motion for summary judgment.

## IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that J.D.'s motion for summary judgment is DENIED. The District's motion for Summary Judgment is GRANTED.

Dated: January 26, 2021

BETH LABSON FREEMAN
United States District Judge